**LEE DYEING COMPANY OF NORTH CAROLINA, Inc., Appellant and Cross-Appellee,**

v.

**WEBCO DYERS, INC., Appellee and Cross-Appellant.**

No. 8103.

United States Court of Appeals Fourth Circuit.

Argued Oct. 3, 1960.

Decided Nov. 10, 1960.

David B. Kirschstein, New York City (Morris Kirschstein, New York City, Thornton H. Brooks, Greensboro, N. C., Kirschstein, Kirschstein & Ottinger, New York City, and McLendon, Brim, Holderness & Brooks, Greensboro, N. C., on the brief), for appellant and cross-appellee.

Paul B. Bell, Charlotte, N. C. (Thomas D. Cooper, Burlington, N. C., Eaton, Bell, Hunt & Seltzer, Charlotte, N. C., and Cooper & Cooper, Burlington, N. C., on the brief), for appellee and cross-appellant.

Before SOPER, HAYNSWORTH and BOREMAN, Circuit Judges.

SOPER, Circuit Judge.

This suit for patent infringement is based on United States Letters Patent No. 2,591,861 issued April 8, 1952, to Lee Dyeing Company of New York, the assignee of Karl E. Pannaci, the inventor, and now owned through assignment by Lee Dyeing Company of North Carolina, the plaintiff in this case. The defendant is Webco Dyers, Inc., a North Carolina corporation, which was formed in 1957 in order to finish goods manufactured by Webco Mills, Inc.

The patent covers an apparatus and a method for the continuous heat setting of stretchable knitted fabrics composed of thermoplastic material such as nylon. Claims 1 to 5 relating to method and claim 9 relating to the apparatus are the claims in suit. The gist of the invention is contained in the italicized concluding clause of claim 1, which is as follows:

"1. The method of continuously setting an elongated, knitted fabric formed of a thermoplastic material, such as nylon, and having transversely-extending courses therein, which comprises securing the longitudinally-extending, marginal edges of said fabric in relatively fixed, parallel-disposed relation at closely spaced points thereof with the ends of each course substantially directly opposite each other; continuously moving said fabric in a longitudinal direction; heating said moving fabric to a temperature at least equal to its stabilizing point as it passes through a zone of limited extent longitudinally of said fabric; *and maintaining said transversely-extending courses, while moving through the zone of heating, in approximately the same relative position as before entering said zone, by applying tension in the direction of movement of said fabric in zones thereof intermediate said marginal edges.*" [Emphasis supplied.]

Warp knit fabric is manufactured on knitting machines and the raw product, or greige goods as it is called, must then be finished by subjecting it to certain wet processing steps such as scouring, bleaching, dyeing, and extracting to remove excess moisture. Then the material is subjected to heat setting so as to stabilize it in its final dimensions. Heat setting is essential since it stabilizes the material so that it can be temporarily distorted by washing or stretching and yet returned to its heat set condition and remain stabilized. Thermoplastics have the faculty of returning to their heat set condition when the finishing process is properly performed.

In order to finish the goods they are first subjected to the processing steps and later to heat setting. The fabric comes from the knitting machines in elongated strips which are then scoured, bleached, dyed or otherwise treated. It is then dried and heat set in a tenter frame, a device which is quite old in the art. The tenter is a machine or frame

fitted with movable parallel chains along the sides of the frame on which are mounted tenter hooks or pins which engage the selvages of the fabric as it moves continuously through the frame. The purpose is to maintain a constant tension of the fabric so that it retains the desired width as it is advanced forwardly through the apparatus and is set even and square when it emerges. It is easy to maintain the proper tension on the edges of the fabric since they are attached to the tenter pins so as to prevent the shrinkage of the material, but it is difficult to prevent shrinkage in the center of the strip as it is drawn through the frame. Customarily the strips are 10-feet or 12-feet wide and the tension of the material in the center of the strip is much less than it is at the edges. Hence shrinkage occurs in the center portion and the fabric will not lie flat when it is spread out to be cut to a pattern. This creates what is known in the trade as the "lay-up" problem. It has long been encountered in finishing knitted and woven fabrics and it was intensified with the advent of thermoplastic yarns which shrink more readily than natural fibres.

The inventor solved the problem very simply. He states in his patent that his principal object is to provide a means and method whereby the longitudinally extending marginal edges of the knitted fabric and the portions between the edges are set to a uniform length throughout the width of the fabric; and that he accomplishes this effect by mounting a pair of rotating rolls at the point that the fabric passes out of the heating chamber and drawing the fabric through the pinch of the rolls under tension. The rolls are shorter than the width of the fabric and the speed of the rolls is adjusted to the speed of the rate of travel of the fabric on the chains. Since the shorter rolls exercise a pull only on the central portions of the fabric the shrinkage of this part is overcome and the length of the strip measured along the center equals the length of the strip measured along the marginal edges. Lee Dyeing Company of New York introduced the patented apparatus in its finishing process in its plant and found it so successful that it formed the plaintiff North Carolina corporation and other subsidiaries in New York and Canada which have likewise attained substantial success in using the method and apparatus disclosed in the patent.

Webco Dyers, Inc., the defendant, was formed as a subsidiary to Webco Mills, Inc., which had formerly been a customer of the plaintiff company. It was formed to finish the warp knit fabrics manufactured by Webco Mills and began operations in July, 1957. It also experienced difficulty in avoiding shrinkage in the finishing operations and sought the advice of other operators including the plaintiff and in October, 1957, was furnished a copy of the patent and offered a license thereunder; but it refused the license stating that it was not practicable to mount the Pannaci device in its equipment and that it had been able to get pretty uniform results by building up the central part of the take-off rolls, thus accomplishing the same tensioning that Karl (Pannaci) describes in his patent. It added that no doubt Karl's device does a better job.

The defendant was referring in these communications to a secondhand machine purchased by it from the liquidators of E. E. Meinig Company which had used the machine for forty years. During this period Meinig had operated the machine off and on with built up take-off rolls, depending upon the kind of fabric that was being manufactured. After it was acquired by the defendant it was operated in substantially the same way as it had been operating at the Meinig plant. The rolls were of light weight aluminum 5 inches in diameter and 12 feet long across the width of the tenter frame and were covered with fabric or tape. They were located just above the tenter frame adjacent to the fabric take-off point. When the machine was acquired by the defendant the upper roll was of even diameter throughout while the lower roll was built up with gummed tape in its center intermediate the ends. The defendant

changed the wrapping, experimentally, from time to time to improve the output and at times increased the build up of the center portion of the bottom roll.

The communications between the parties led to the institution of the pending suit on April 25, 1958. At or about this time defendant had noticed that there was some slippage of the material as it passed through the rolls of its machine and after taking further advice it substituted heavier steel rolls of the same dimension in place of the aluminum rolls. This was done in May, 1958. Testimony of the defendant shows that when it installed the new rolls it wrapped the lower roll in coarse cotton fabric (Osnaburg) and the upper roll in the blanket-like material and that the wrapping of each roll was applied uniformly without any attempt to create some areas larger in diameter than others. The ends of the lower roll rested on bearings on each side of the frame and the upper roll rests on the lower with its ends in movable bearings so that substantially the whole weight of the upper rested on the lower roll.

Although the wrapping of the upper roll in the blanket-like material was uniform when it was first put to use, the covering tended to become more dense and compact as it was used, more at the end portions than at the center, so that the measurement of the circumference of the upper roll showed some variation. The plaintiff's expert inspected and measured this roll and testified that the circumference increased slightly from the ends of the roll to the center so that the diameter of the roll in the center was about one-tenth of an inch longer than at the ends. This indicated that the radius acting on the cloth at the nip of the rolls was one-twentieth of an inch longer at the center than at the ends.

The plaintiff's claim of infringement is based upon this testimony, indicating that the center of the defendant's upper roll was built up to the extent described. The plaintiff's expert also testified that the rolls were run at a slightly greater speed than the speed of the tenter chains and that the fabric was passed through the rolls in an S-shape so that it contacts a larger area of the central rolls than if it were merely passed between them. The theory of the plaintiff is that this testimony proves that the defendant caused the fabric passing through the rolls to be gripped more tightly at its central zones than at its side edges so that the central zones are subjected to a tension greater than that of the ends, and thereby the defendant gets the same effect as is obtained by the use of the shorter rolls operating upon the central zones of the fabric as disclosed in the patent. Hence it is said that the defendant's method and apparatus is equivalent to that of the patent and therefore infringes.

The defendant's answer to this contention is based on evidence produced by it (and accepted by the District Judge) tending to show that its apparatus does not subject the central part of the fabric as it passes through the rolls to a greater tension than is applied to the end portions. In the first place, there was evidence that a sag or deflection of the rolls, which is conceded to be a fairly well known phenomenon, is produced by the manner in which the rolls are supported. The heavy lower roll is supported only at its ends and the top roll is placed upon the bottom roll. The bearing points on the upper roll are movable and are closer together than the bearing points on the bottom roll, which are rigidly installed. This construction, according to defendant's witnesses, causes a sag of approximately one-sixteenth of an inch in the center portion of the lower roll and in consequence the pressure or grip between the rolls at the ends is greater than in the center. Indicative of this deflection is the contrast between the fluffy condition of the nap of the blanket in the center and its compact condition in the end portions, and it was demonstrated by comparing the slight dip in the transverse course of the lower roll with that of a string tautly stretched across the frame above the lower roll. Measurements of the pull upon the fabric by the use of a hand weighing scale indicated

that the nip of the rolls in the center was much lighter than it was at the ends, and hence it appeared that the central portions were subjected to a lighter pull and move forward more slowly than the ends. All of this evidence offered by the defendant tended to show that, contrary to the teaching of the patent, there was less tension in the direction of the movement of the fabric in the intermediate zones than in the marginal edges. The plaintiff urges that this testimony should not have been accepted by the judge since the tests were made ex parte; but the evidence relating to them was given in detail and subjected to careful cross-examination and the District Judge, in his findings of fact, reached the specific conclusion that the central zones of the fabric in the defendant's heat setting operation are advanced at a surface speed less than the side portions of the fabric. We cannot say that these findings are erroneous.

In addition, the defendant offered affirmative proof as to how its lay-up problem was solved. It showed that its tenter frame is equipped with a conventional overfeed device at the in-put end whereby the central portion of the fabric is fed into the frame ahead of the side portions prior to the heat setting of the fabric, with the result that as the fabric goes through the frame the central portions gradually lag backward so as to be in substantial alignment with the edges when the fabric leaves the frame at the take-off rolls. The plaintiff strenuously disputes the weight of this evidence. It points out that at the hearing of the testimony in the court below a strip of defendant's fabric which had been subjected to its finishing process and produced as an exhibit by the defendant was actually longer in the center than in the ends, indicating that the central portions had been subjected to greater tension as in the method of the patent. This incident in the taking of the evidence was entitled to consideration but was not conclusive. So far as the record discloses the condition of the fabric could have been produced either by increased tension in the central portion of the fabric or by an excess of the overfeed of the material at the in-put end of the apparatus. Consequently, we cannot say that the District Judge who heard the testimony was wrong in his specific findings that the defendant overfeeds the central zones of the fabric so that they are forward of the sides when placed in the tenter machine and that by reason of the deflection in the take-off roll of the defendant's frame there is less pressure between the rolls at the center portions than at the ends.

We are in accord with the findings of the District Judge that infringement of the patent has not taken place. Having reached this conclusion it is unnecessary to consider the additional conclusions of the District Judge that the method and apparatus used by the defendant was known and in public use more than a year prior to the filing of the patent in suit, and that the patent is valid only if the claims thereof are restricted to the particular apparatus disclosed in the specifications.

Affirmed.